RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

v.

SYLVIA HOFSTETTER (20-6245); HOLLI WOMACK (20-6426); CYNTHIA CLEMONS (20-6427); COURTNEY NEWMAN (20-6428),

        *Defendants-Appellants*.

⎱ Nos. 20-6245/6426/6427/6428

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:15-cr-00027—Thomas A. Varlan, District Judge.

Argued: January 18, 2022

Decided and Filed: April 11, 2022

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Loretta G. Cravens, CRAVENS LEGAL, Knoxville, Tennessee, for Appellant in 20-6245. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 20-6426. Randall E. Reagan, THE LAW OFFICE OF RANDALL E. REAGAN, Knoxville, Tennessee, for Appellant in 20-6427. Christopher J. Oldham, Knoxville, Tennessee, for Appellant in 20-6428. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Loretta G. Cravens, CRAVENS LEGAL, Knoxville, Tennessee, for Appellant in 20-6245. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 20-6426. Randall E. Reagan, THE LAW OFFICE OF RANDALL E. REAGAN, Knoxville, Tennessee, for Appellant in 20-6427. Christopher J. Oldham, Knoxville, Tennessee, for Appellant in 20-6428. Brian Samuelson, Tracy L. Stone, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

**OPINION**

_____

COLE, Circuit Judge.  Between 2009 and 2015, Sylvia Hofstetter managed three "pain-management clinics" in Florida and Tennessee on behalf of three clinic partners.  Hofstetter also co-owned and managed an additional clinic in Tennessee from 2012 to 2015 without those partners.  Cynthia Clemons, Courtney Newman, and Holli Womack were employed as nurse practitioners at these clinics in 2013 and 2014.  The clinics displayed numerous indicators of illegal opioid prescription practices, so the government investigated all four women and eventually indicted them on multiple charges.  A four-month trial ensued, and the jury convicted each defendant of maintaining at least one drug-involved premises.  Hofstetter was also found guilty of conspiring to distribute controlled substances, distributing controlled substances, and money laundering.

On appeal, the defendants challenge their maintaining-a-drug-involved-premises conviction, arguing that: (1) the underlying statute is unconstitutionally vague as applied to them; (2) the district court erred when instructing the jury; (3) insufficient evidence supported the jury's verdict; and (4) the jury's verdict was inconsistent.  Hofstetter separately raises additional issues specific to her convictions, including that: (1) the district court abused its discretion when it denied three evidentiary challenges; (2) the district court erred when instructing the jury about her distribution-of-a-controlled-substance charge; and (3) she did not receive a fundamentally fair trial due to spoliation, *Brady* obligations, and the government's improper remarks during closing arguments.  Finding no error, we affirm on all issues.

## I. BACKGROUND

Beginning in 2008 or 2009, three partners ran a medical clinic in Hollywood, Florida.  The Florida partners hired Sylvia Hofstetter to work at the clinic's front desk, and she soon became the office manager.  One of the partners admitted that, over time, pain management dominated the clinic's business, so much so that the other practice areas dwindled, and the clinic eventually became a "pill mill."  During this period, the Florida partners suspected Hofstetter of

embezzling funds from the clinic, and they fired her. A few months later, following a year-long investigation, the Drug Enforcement Administration ("DEA") raided the Hollywood clinic and seized approximately 1,900 patient files. The U.S. Attorney's Office for the Southern District of Florida declined to prosecute the case due to its already high workload.

A few months before the raid, the Florida partners decided to open another pain clinic in Knoxville, Tennessee on Gallaher View Road. The partners asked a new employee, Christopher Tipton, to help them expand. They also re-hired Hofstetter and put her in charge of day-to-day operations at the Gallaher View clinic, despite her suspected history of embezzlement. The next year, in 2011, the Florida partners opened a third clinic in Lenoir City, Tennessee, and Hofstetter ran this clinic too. One of the Florida partners testified that the partners did not intend Gallaher View or Lenoir City to be legitimate clinics, and that Hofstetter was involved in discussions about their intent "to open pill mills in Tennessee." (Trial. Tr., R. 936, PageID 74947–48.)

In 2012, after receiving many complaints from neighboring businesses and pressure from their landlord, the Florida partners closed the Gallaher View clinic and transferred its patients to the Lenoir City clinic. When the Gallaher View clinic closed, Hofstetter approached Tipton about opening their own clinic together but without the Florida partners. Tipton agreed, and he and Hofstetter opened a "secret clinic" on Lovell Road.[1] (Trial Tr., R. 918, PageID 64999.) To identify new patients for the Lovell Road clinic, Hofstetter instructed her staff to call patients who had been discharged from other pain clinics for exhibiting signs of drug abuse. The FBI began investigating all the Tennessee clinics in 2013 or 2014 and eventually shut down both the Lenoir City clinic and the Lovell Road clinic on March 10, 2015.

Cynthia Clemons, Courtney Newman, and Holli Womack were nurse practitioners at the Lenoir City and Lovell Road clinics in 2013 and 2014. During their tenures at the clinics, Clemons, Newman, and Womack each wrote hundreds of prescriptions, only three percent of which were for non-opioids and non-benzodiazepines.

---

[1]This clinic was initially located on Gallaher View Road. Hofstetter and Tipton moved it to Lovell Road in 2013, but the procedures, staff, and patients were the same at both locations. We refer to this clinic as the "Lovell Road clinic" to avoid confusion with the first clinic on Gallaher View Road.

The government filed the first indictment in this case on March 4, 2015.  Over the next three years, the government filed a series of superseding indictments and eventually filed the fourth and final superseding indictment on May 1, 2018.  The final 21-count indictment charged all four defendants-appellants[2]—Hofstetter, Clemons, Newman, and Womack—with maintaining a drug-involved premises and conspiring to distribute and dispense controlled substances.  Additionally, Clemons, Hofstetter, and Newman were charged with illegally distributing and dispensing controlled substances.  Hofstetter was also charged with a RICO conspiracy, two counts of conspiring to launder money, and five counts of money laundering.

On October 21, 2019, the four defendants proceeded to a four-month jury trial.  At trial, the government's witnesses included one of the Florida partners, Tipton, and the clinics' former medical directors, employees, patients, and neighbors.  Collectively, they testified that the owners and medical directors knew the clinics were not legitimate pain management clinics, as did some staff and patients.  They also testified that Hofstetter prioritized profit over patient care by soliciting and accepting patients who had been discharged from other clinics for addiction-related behaviors; restricting the length of appointments to maximize fee collection; and instructing non-qualified staff to see patients and fill out patient charts.

The government's expert witnesses, including nurse practitioners, anesthesiologists, and pain-management physicians, also testified that Clemons, Newman, and Womack failed to maintain adequate patient charts, and that they prescribed opioids at extremely high doses after incomplete medical examinations and diagnoses that fell below the standard of care.  Witness testimony also portrayed the clinics as displaying numerous "red flags" indicative of criminal activity.  *See infra* parts II.C.i and II.D.

After the government closed its case-in-chief, the defendants each moved for judgments of acquittal.  The district court initially reserved ruling on these motions but later denied them, finding that "the government ha[d] presented sufficient evidence for a rational jury to return a verdict of guilty [on] all counts." (Trial Tr., R. 885, PageID 60982–90.)

---

[2]The government indicted 130 defendants in this case, including the Florida partners, Tipton, and other clinic staff.  Except for Hofstetter, Clemons, Newman, and Womack, all other defendants pleaded guilty for their roles in operating or benefitting from the clinics.

The jury issued its verdict on February 13, 2020. It found all four defendants guilty of maintaining a drug-involved premises at Lovell Road, and it convicted Hofstetter and Clemons of maintaining a drug-involved premises at Lenoir City. The jury also acquitted Clemons, Newman, and Womack of multiple charges, including drug conspiracy charges and distribution-of-controlled-substances charges.

Hofstetter was separately found guilty of maintaining a drug-involved premises at Gallaher View, a RICO conspiracy charge, two drug conspiracy charges, two money laundering conspiracy charges, two counts of money laundering, and one count of illegally distributing and dispensing controlled substances. She was acquitted of two distribution charges.

The defendants renewed their motions for acquittal following the verdict, and they also requested a new trial. The district court denied these motions without a hearing on September 14, 2020.

Hofstetter was sentenced to 400 months in prison, Clemons to 42 months, Newman to 40 months, and Womack to 30 months. The defendants timely appealed their judgments of conviction and sentences. This Court has appellate jurisdiction under 28 U.S.C § 1291.

II. ANALYSIS

**A. The Constitutionality of 21 U.S.C. § 856(a)(1)**

Clemons, Newman, and Womack superficially challenged the constitutionality of 21 U.S.C. § 856(a)—the maintaining-a-drug-involved-premises statute—in their motions for acquittal, asserting summarily that the statute is void for vagueness. Hofstetter did not raise this challenge at all before the district court. The district court ruled that the defendants had waived the argument but nevertheless analyzed its merits when the court denied the motions. The district court's merits analysis preserves this argument for appeal. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011). We therefore review de novo the question of whether § 856(a) is unconstitutionally vague. *United States v. Hart*, 635 F.3d 850, 856 (6th Cir. 2011) (citing *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001)).

A criminal statute is vague if it either "fails to provide the kind of notice that [] enable[s] ordinary people to understand what conduct it prohibits" or "encourages arbitrary and discriminatory enforcement." *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) (internal quotation omitted) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)), *vacated on other grounds*, 543 U.S. 1182 (2005). "Few statutes meet the void-for-vagueness threshold: a 'strong presumptive validity' applies to all acts of Congress and mere 'difficulty' in determining a statute's meaning does not render it unconstitutional." *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir. 2020) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). Hypothetical vagueness is not enough to warrant a new trial—the statute must be unconstitutionally vague as applied to this particular case. *Id.*; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) ("We consider whether a statute is vague as applied to the particular facts at issue[.]"). Accordingly, to prevail, the defendants must show that § 856(a)(1) failed to provide sufficient warning that their conduct would violate the law. *See Kettles*, 970 F.3d at 650.

We have not yet decided whether § 856(a)(1) is unconstitutionally vague in a published opinion. *Cf. United States v. Rosa*, 50 F. App'x 226, 227 (6th Cir. 2002) (holding that § 856(a)(2) was not unconstitutionally vague as applied to the defendant because it furnished fair notice). Defendants ask us to find that § 856(a)(1) is unconstitutionally vague for three reasons. First, they contend that the phrase "for the purpose of . . . distributing . . . controlled substances" renders § 856(a)(1) unconstitutional because, read literally, any staff member at a pharmacy or physicians' office would violate the statute. At heart, this argument relates to the notice and breadth of the statute with respect to others (not to the defendants themselves), so we need not address it. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."). Second, the defendants suggest that they were convicted of *lawful* distribution under the plain language of the statute, thereby demonstrating that § 856(a) is impermissibly vague. And third, the defendants claim that the statute did not provide them with fair notice about the illegality of their conduct. Because the defendants contend that the statute is ambiguous, they ask us to apply the rule of lenity.

The government takes the opposite view.  It cites to cases that examine the applicability of § 856(a)(1) to drug possession or distribution from private homes and urges us to adopt here a similar interpretation of the law.  *See United States v. Shetler*, 665 F.3d 1150, 1164–65 (9th Cir. 2011); *United States v. Lancaster*, 968 F.2d 1250, 1253–54 (D.C. Cir. 1992); *United States v. Clavis*, 956 F.2d 1079, 1094 (11th Cir. 1992).  In this peripheral context, the cases hold that the phrase "for the purpose of" gives fair notice to a defendant accused of distributing controlled substances out of their personal residence because it excludes one-off drug sales or incidental consumption at home.  *Lancaster*, 968 F.2d at 1253–54; *Clavis*, 956 F.2d at 1094.  These cases, however, do not concern pain management clinics, so those arguments do not aid our consideration of the question the defendants raise here.

We conclude that § 856(a)(1) is not unconstitutionally vague as applied to the defendants because their conduct put them on notice that they violated the statute, regardless of any potential vagueness when applied to differently situated medical practitioners.  There is no as-applied vagueness when a statute furnishes fair notice that a defendant's conduct, if proven at trial, is proscribed.  *See United States v. Farah*, 766 F.3d 599, 614 (6th Cir. 2014) (rejecting a void for vagueness claim when the defendant's conduct "surely [fell] within the ambit of [the statute]").  Here, the jury concluded that the defendants knowingly used the clinic to distribute controlled substances illegally, and there was sufficient evidence to support that conclusion.  *See infra* part II.C.i.  Section 856(a)(1) prohibits such conduct, so the defendants had notice that their illegal prescription practices fell within the statute's purview.

Moreover, contrary to the defendants' assertion that they could have been convicted under § 856(a)(1) for *lawful* opioid distribution, the procedural history of this case shows that this did not occur here.  The government indicted the defendants for "knowingly and intentionally open[ing], us[ing], and maintain[ing] a business . . . for the purpose of illegally distributing and dispensing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose[.]"  (Fourth Superseding Indictment, R. 320, PageID 5235.)  The district court instructed the jury to find the defendants guilty only if the government proved that the drug distribution occurred "for the purpose of illegally distributing Schedule II controlled substances[.]"  (Trial Tr., R. 897, PageID 61800.)  The government

submitted sufficient evidence for the jury to conclude that the defendants maintained or used the clinics for the purpose of distributing controlled substances illegally. *See infra* part II.C.i. And the jury's verdict form indicated that the defendants were found guilty for using or maintaining the clinic "for the purpose of illegally distributing Schedule II controlled substances[.]" (Jury Verdict, R. 860, PageID 60530.) Whether section 856(a) may be read to convict a defendant for *lawful* opioid prescriptions has no bearing on this case. Thus, to the extent the defendants argue that the statute led to arbitrary enforcement, their argument lacks merit. We therefore decline to order a new trial on this basis.

## B. The Jury Instructions

We generally review the legal accuracy of jury instructions de novo. *United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020) (citing *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011)). If a district court refuses to issue an instruction as requested by a defendant, however, the given instruction "must amount to abuse of discretion in order for us to vacate a judgment." *Id.* And if a defendant did not request a specific instruction from the district court, we review the instruction for plain error. *United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012).

### i. The Drug-Involved Premises Instruction

All four defendants were charged with maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). At the close of evidence, the district court instructed the jury as follows:

> Count 13 of the superseding indictment charges that from in or about September 2013 through on or about March 10, 2015 . . . Hofstetter, Newman, Clemons, and Womack, aided and abetted by one another and others, did knowingly and intentionally, open, use, and maintain a business . . . for the purpose of illegally distributing Schedule II controlled substances . . . .

> In order to prove a defendant guilty of opening, using, or maintaining a drug-involved premises, the government must prove each of the following elements beyond a reasonable doubt . . . :

> First, that the defendants knowingly opened, used, or maintained a place, whether permanently or temporarily;

And second, that the defendant did so for the purpose of distributing any controlled substance.

(Trial Tr., R. 897, PageID 61800.)  The defendants now argue that the district court's § 856(a)(1) instructions were erroneous because the "jury should have been instructed that the distribution of the controlled substances from the clinics had to have been done without a legitimate medical purpose and outside the usual course of professional practice."  (Clemons Br. 41; *see also* Hofstetter Br. 44; Newman Br. 24; Womack Br. 23–24.)  In other words, because the district court did not include *illegal* distribution as a third element of the § 856(a)(1) offense, the defendants say the instructions violated their due process rights.  *See Patterson v. New York*, 432 U.S. 197, 210 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.").  The defendants also submit that the § 856(a)(1) instructions were confusing, misleading, and prejudicial.

Before the district court issued the above instructions, it provided the defendants with advance copies of its proposed language and convened three charging conferences to review the draft instructions.  None of the defendants objected to the § 856(a)(1) instructions at that time. We therefore review the instructions "as a whole, for plain error."  *United States v. Stewart*, 729 F.3d 517, 530 (6th Cir. 2013).  "To prevail on plain-error review, [a] defendant must show: (1) error, (2) that is clear and obvious, and (3) that affects [her] substantial legal rights."  *Id.* at 528–29.  "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice."  *Id.* at 530 (quoting *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010)).  "[A]n improper jury instruction will rarely justify reversal of a criminal conviction when no objection [was] made at trial," and "an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law."  *Id.* (quoting *United States v. Rayborn*, 491 F.3d 513, 521 (6th Cir. 2007)).

This Court has already concluded that the § 856(a)(1) instructions in this case were not clearly erroneous, in two nearly identical orders that responded to motions for release pending appeal by Clemons and Newman.  *United States v. Clemons*, No. 20-6427, Dkt. 23-2, slip op. 3

(6th Cir. Feb. 25, 2021); *United States v. Newman*, No. 20-6428, Dkt. 18-2, slip op. 3 (6th Cir. Feb. 18, 2021).  The previous panel provided three main reasons for doing so.

First, "the instruction was an accurate statement of the law" because it set forth the elements of a § 856(a)(1) violation "exactly as listed in the United States Code." *Clemons*, slip op. 3; *Newman*, slip op. 3.  In general, "a proposed jury instruction must be a correct statement of [the] law," so we do not find fault on the part of the district court when it issues instructions that "more closely mirrored the statute" than the defendant's proposed language does.  *Pritchard*, 964 F.3d at 523 (internal quotation omitted).  We therefore agree that we "cannot conclude the district court abused its discretion," much less plainly erred, in providing "language more faithful to the statute" over the defendants' alternative language.[3]  *Id.*

Second, "this [c]ourt has consistently listed the elements of a 21 U.S.C. § 856(a) conviction without including illegal distribution," even in pill mill cases.  *Clemons*, slip op. 3; *Newman*, slip op. 3; *see also United States v. Sadler*, 750 F.3d 585, 592 (6th Cir. 2014) ("To support [a § 856(a)(1)] charge, the government had to show that the [defendants] knowingly maintained their [pain] clinics for the purpose of distributing a controlled substance."); *United States v. Lang*, 717 F. App'x 523, 545 (6th Cir. 2017) ("To convict a defendant on [a § 856(a)(1)] charge[], the government must prove beyond a reasonable doubt that the defendant (1) knowingly (2) maintained any place, whether permanently or temporarily, (3) for the purpose of distributing a controlled substance.") (citing *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010)).  Defendants do not cite, and we have not found, any case law that answers the question of whether the district court was required to list *illegal* drug distribution as one of the elements of a § 856(a)(1) offense in a pill mill case.  And "[a] lack of binding case law that answers the question presented" precludes "our finding of plain error."  *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015) (citing *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013)).

---

[3]Womack contends that two recent Supreme Court decisions demonstrate that "merely tracking the language of the statute may not suffice to properly instruct a jury as to what they must find for guilt." (Womack Br. 24 (citing *Rehaif v. United States*, 139 S. Ct. 2191, 2199 (2019), and *Maslenjak v. United States*, 137 S. Ct. 1918, 1930 (2017).)  These cases, however, contain inapposite facts and do not bear on the instructions at issue here.

Third, "taken as a whole, [the instructions] made it clear to the jury that they had to determine that the premises were used for the illicit distribution of drugs." *Clemons*, slip op. 4; *Newman*, slip op. 4. The district court began by instructing the jury that the § 856(a)(1) offense "charges that . . . [the defendants] did knowingly and intentionally open, use, and maintain a business . . . *for the purpose of illegally distributing Schedule II controlled substances*[.]" (Trial Tr., R. 897, PageID 61800 (emphasis added).) This explanation immediately preceded the district court's recitation of the statutory elements of a § 856(a)(1) offense. Given the proximity of the illegality explanation to the recitation of the elements, the instruction did not "likely produce a grave miscarriage of justice." *Stewart*, 729 F.3d at 530. Furthermore, the indictment and the jury verdict form underscore the completeness of the jury instruction when taken as a whole because language in both also made clear that the defendants were being charged for and convicted of unlawful opioid distribution. Accordingly, the district court did not plainly err by giving the instruction, and we affirm the district court.

### ii. The Pinkerton Liability Instruction

Hofstetter and Newman were both charged with distributing and dispensing controlled substances, aided and abetted by each other, in violation of 21 U.S.C. § 841. The district court explained to the jury that the government could prove Hofstetter and Newman guilty of this crime in one of three ways:

> The first is by convincing you that they personally committed or participated in this crime.

> The second is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy and are within the reasonably foreseeable scope of the agreement.

(Trial Tr., R. 897, PageID 61819–20.) Third, the district court also noted that the jury could find the defendants guilty "if [they] intentionally helped or encouraged others to commit the crime"— that is, under an aiding and abetting theory of liability. (*Id*. at PageID 61819.) Only Hofstetter was convicted.

Hofstetter argues on appeal that the jury should not have been told about the second conspiracy-based method of liability. In particular, she claims that the jury should not have been

able "to consider the conspiracy law as a means to convict" her because she was not charged with conspiracy in this count, and the elements for aiding and abetting are different from conspiracy. (Hofstetter Br. 20.) Because she did not object to the district court's instructions before it issued them, we review the instructions for plain error. *Semrau*, 693 F.3d at 527.

The conspiracy-based method that the district court outlined is known as *Pinkerton* liability. *See Pinkerton v. United States*, 328 U.S. 640 (1946). "*Pinkerton* is a doctrine about guilt-stage liability for a co-conspirator's substantive offenses." *United States v. Hamm*, 952 F.3d 728, 747 (6th Cir.), *cert. denied*, 140 S. Ct. 2695 (2020), and *cert. denied sub nom. Shields v. United States*, 141 S. Ct. 312 (2020). We have long held that "persons indicted as aiders and abettors"—as Hofstetter was with respect to this claim—"may be convicted pursuant to a *Pinkerton* instruction." *United States v. Lawson*, 872 F.2d 179, 182 (6th Cir. 1989) (quoting *United States v. Cerone*, 830 F.2d 938, 944 (8th Cir. 1987)). Further, "a district court may properly provide a *Pinkerton* instruction regarding a substantive offense, even when the defendant is not charged with the offense of conspiracy." *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2007) (affirming the district court's instructions, which included a *Pinkerton* instruction for a non-conspiracy offense); *see also United States v. Adkins*, 372 F. App'x 647, 652 (6th Cir. 2010). Accordingly, there is no plain error in the district court's given instruction, and we affirm.

### iii.  The Deliberate-Indifference Instruction

Hofstetter also challenges the district court's deliberate-indifference instruction with respect to her distribution charge. Hofstetter requested different instructions than the one the district court gave, so this Court reviews the district court's instruction for abuse of discretion. *See Pritchard*, 964 F.3d at 522. "A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge fails accurately to reflect the law." *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010) (internal quotation and citation omitted).

To convict Hofstetter of unlawful distribution under 21 U.S.C. § 841(a)(1), the government was required to prove that Hofstetter "knowingly or intentionally" distributed a

controlled substance "outside the scope of professional medical practice and not for a legitimate medical purpose[.]" (Trial Tr., R. 897, PageID 61805.)  With respect to the knowledge element, the district court instructed the jury that Hofstetter could be found liable under the doctrine of deliberate indifference:

> Although knowledge of the defendant cannot be established merely by demonstrating that she was careless, knowledge may be inferred if the defendant deliberately blinded herself to the existence of a fact.  No one can avoid responsibility for a crime by deliberately ignoring the obvious.
>
> If you are convinced that a defendant deliberately ignored a high probability that the controlled substances, as alleged in these counts, were distributed outside the usual course of professional practice and not for a legitimate medical purpose, then you may find that the defendant knew that this was the case.
>
> But you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that the controlled substances were distributed outside the usual course of professional practice and not for a legitimate medical purpose, and that the defendant deliberately closed her eyes to what was obvious.
>
> Carelessness or negligence or foolishness on her part are not the same as knowledge, and are not enough to find her guilty of any offense charged under this law.

(*Id.* at PageID 61806–07.)    Hofstetter argues that this instruction does not incorporate the deliberate indifference standard announced in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  Specifically, Hofstetter claims the jury should have been instructed that a defendant is not deliberately indifferent unless she "subjectively believe[s] that there is a high probability that a fact exists" and "take[s] deliberate actions to avoid learning of that fact." (Hofstetter Br. 40 (quoting *Global-Tech*, 563 U.S. at 769).)

Hofstetter's proposed instruction and the one given are functional equivalents: both require the defendant to have been aware of a "high probability" that a fact exists and to have "deliberately" avoided full knowledge.  In addition, the district court's instruction tracks (and adds to) the language in this Court's model jury instructions on deliberate indifference, which have been approved as consistent with *Global-Tech*.  *See* Sixth Circuit Pattern Instruction 2.09; *United States v. Reichert*, 747 F.3d 445, 451 (6th Cir. 2014).  The Supreme Court also acknowledged that similar instructions complied with *Global-Tech*.  563 U.S. at 769 & n.9 (citing, *e.g.*, *United States v. Holloway*, 731 F.2d 378, 380–81 (6th Cir. 1984) (per curiam)).

Accordingly, the district court did not abuse its discretion with respect to the deliberate-indifference instruction.

Because there is no plain error in either the maintaining-a-drug-involved-premises instruction or the *Pinkerton* instruction, and because the district court did not abuse its discretion by instructing the jury as to deliberate indifference, we affirm each of the three contested jury instructions.

## C.  Sufficiency of the Evidence

We review de novo the sufficiency of the evidence to sustain a conviction when a defendant raises a challenge under Federal Rule of Criminal Procedure 29.  *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (quoting *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009)).

Rule 29 requires courts to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction[,]" regardless of the jury's verdict, upon a defendant's motion.  Fed. R. Crim. P. 29(a).  When considering the sufficiency of the evidence, we "review[] the evidence in the light most favorable to the prosecution" and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Emmons*, 8 F.4th at 477–78 (quoting *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010)).  In so doing, we make "[a]ll reasonable inferences . . . to support the jury verdict[,]" *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017), and do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury," *Emmons*, 8 F.4th at 478 (quoting *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (alteration in original)).  Moreover, "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."  *LaVictor*, 848 F.3d at 456 (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

"[A] defendant claiming insufficiency of the evidence [therefore] bears a very heavy burden."  *Emmons*, 8 F.4th at 478 (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)).  And "[t]he general hesitancy to disturb a jury verdict applies with even greater force

when a motion of acquittal has been thoroughly considered and subsequently denied by the trial judge." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (internal quotation and citation omitted).   Here, on two separate occasions, the district court held that there was sufficient evidence to support the jury's verdict on these counts.   We find the same.

### i. The Drug-Involved Premises Convictions

The four defendants were each charged with one to three counts of maintaining a drug-involved premises under 21 U.S.C. § 856(a)(1).   They were also charged for these offenses under 18 U.S.C. § 2, which imposes liability under an aiding and abetting theory.   Hofstetter was convicted of three counts, Clemons of two, and Newman and Womack of one each.   All four defendants argue that there was insufficient evidence to support their convictions.

To support a conviction under § 856(a)(1), the government needed to prove, beyond a reasonable doubt, that the defendants "knowingly open[ed], lease[d], rent[ed], use[d], or maintain[ed] any place, whether permanently or temporarily," for the purpose of illegally distributing controlled substances.   *United States v. Elenniss*, 729 F. App'x 422, 428 (6th Cir. 2018) (quoting 21 U.S.C. § 856(a)(1)); *see also United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010).

### a. Knowingly

First, the government submitted significant circumstantial evidence that would allow a reasonable jury to conclude that the defendants knew they maintained or used the clinics to distribute controlled substances illegally.   For example, none of the clinics accepted insurance, and each charged a flat cash fee of $300 to $350 per appointment.   Third parties often paid other patients' fees, and groups of patients sometimes arrived together in a single car, often from out-of-county.   The waiting rooms were frequently crowded to standing room only, and patients commonly waited hours for appointments.

Additionally, former patients testified that they went to the clinics while exhibiting symptoms of drug withdrawal, appearing "high" or "junked out."   (Trial Tr., R. 922, PageID 66038–40; Trial Tr., R. 923, PageID 66206.)   The signs of addiction were "obvious."   (Trial Tr.,

R. 921, PageID 65599.)  One witness said the parking lot "looked more like . . . a place where people go to get high versus go to obtain a prescription." (Trial Tr., R. 924, PageID 66518–19.) A former staff member testified that, on his first day, he found a crowd of people waiting for the Lenoir City clinic to open, who were "all talking to each other about [which provider] . . . would get them the most medicine." (Trial Tr., R. 936, PageID 74712, 74722–23.)  The Gallaher View and Lovell Road clinics received complaints that the clinics' customers engaged in petty crimes and drug deals and discarded syringes in the clinic parking lots.

The clinics also allegedly fostered criminal activity among the staff members, who engaged in kickback schemes from pharmaceutical companies and drug-testing laboratories in return for their business.  Staff members also accepted bribes from patients in return for their help in passing drug tests or skipping long wait times.

Other former staff members quit the clinics shortly after being hired.  For example, a former physician's assistant quit after just six weeks on the job.  She testified: "You go into a clinic like that, and you see all of the irregularities.  You see all of the different things happening. You look at the patients.  You put it all together. . . . [T]hat place did not follow medical standard of care." (Trial Tr., R. 919, PageID 65328–29.)  She drew these conclusions without having any previous pain management experience.

Former clinic medical directors echoed these concerns, sometimes raising them with Hofstetter directly.  For example, former medical director Dr. Marc Valley prepared a report outlining all the problems of the clinics—including prescriptions that had "no purpose in chronic pain management" and diagnoses that did not support the use of controlled substances.  (Gov't Trial Ex. 498, R. 1188-7, PageID 81135.)  His report concluded: "This clinic fits all criteria for the definition of 'Pill Mill.' . . . . [T]his is the most egregious example of inappropriate medical oversight and opioid management that I have ever seen." (*Id.* at PageID 88136–37.)  He gave the report to Hofstetter.

It is true, as the defendants emphasize, that some of the government's witnesses testified only about one particular clinic and not about the others.  Other witnesses did not know or interact with each defendant.  And still others did not notice illegal or concerning activity at the

clinics.  But we cannot reweigh the evidence, reevaluate witness credibility, or prioritize our judgment over the jury's, so these discrepancies do not counsel in favor of reversal.  *Callahan*, 801 F.3d at 616.  It is also true that the government did not produce any direct evidence that Clemons, Womack, and Newman *knowingly* used the clinics for the purpose of illegal drug activity.  But this is irrelevant.  Circumstantial evidence, on its own, is sufficient to sustain a conviction.  *LaVictor*, 848 F.3d at 456.  And here, there is certainly enough circumstantial evidence to support the jury's conclusion that the defendants "would know that the clinics in this case were pill mills, and by choosing to associate themselves with the clinics, . . . [they] agreed to assist in the diversion of opioids to drug addicts and drug dealers."  (Trial Tr., R. 885, PageID 60983.)

### b.  Maintained or Used

A defendant need not lease or own the building to "maintain" it under the second element.  *Russell*, 595 F.3d at 644.  Instead, "*control*, duration, acquisition of the site, renting or furnishing the site, repairing the site, *supervising*, protecting, supplying food to those at the site, and continuity" all evince "maintenance."  *Id.* (emphasis added).  The government submitted sufficient evidence to show that Hofstetter supervised the clinics.  She oversaw the clinics as office manager and part owner by administering daily operations and managing personnel.  She controlled the clinics by instructing staff to modify medical records and directing employees without medical licenses to attend to patients.

The record also sufficiently supports a finding that Clemons, Newman, and Womack "used" the clinics for the purpose of distributing controlled substances illegally.  Section 856(a)(1) "uses the disjunctive conjunction 'or' between the listed alternative ways of violating the statute, [so] § 856(a)(1) is violated simply by *using* a place for the commission of the specified drug crimes; proof that the defendant 'maintain[ed]' the premises, which is a separate way of violating the statute, is not necessary for conviction."  *United States v. Facen*, 812 F.3d 280, 289 (2d Cir. 2016).  Thus, whether the government proved that Clemons, Newman, and Womack "maintained" the premises is not the sole inquiry; we must also consider whether the defendants used the premises for the purpose of illegal drug distribution.

The government showed that Clemons, Newman, and Womack each used the clinics to write hundreds of prescriptions for opioids and benzodiazepines during their tenures at the clinics, and in roughly the same proportion: 54 to 57 percent of their prescriptions were for oxycodone, 24 to 33 percent for oxymorphone, and 8 to 14 percent for morphine. Non-opioid, non-benzodiazepines accounted for less than three percent of their prescriptions. Drawing the evidence in the light most favorable to the prosecution, the jury could have reasonably concluded that Hofstetter maintained the clinics, and Clemons, Newman, and Womack used the clinics, to distribute drugs illegally.

### c. For the Purpose of Illegal Distribution

To prove the last element, the government was required to show that each defendant "was significantly motivated to maintain [or use] the premises for drug-related purposes." *United States v. Serrano-Ramirez*, 811 F. App'x 327, 339 (6th Cir. 2020); *see also Russell*, 595 F.3d at 642 (finding that a defendant maintains or uses a place "for the purpose of" distributing drugs if the "drug distribution was a *significant or important reason*"). There must also be sufficient evidence that the controlled substances were distributed illegally, or "without a legitimate medical purpose." *United States v. Chaney*, 921 F.3d 572, 591 (6th Cir. 2019).

Sufficient evidence supports this element as to each defendant. When Hofstetter opened her own clinic with Tipton at Lovell Road, she instructed her staff to solicit patients that had been discharged from other pain clinics for signs of drug abuse, such as displaying "track marks" or testing positive for illegal drugs. (Trial Tr., R. 906, PageID 76749.) Hofstetter used this strategy to build much of the initial patient base at Lovell Road. The government also submitted evidence that Hofstetter prioritized profit over patient care: she limited appointments to 15 minutes, she instructed staff members with no medical training to fill out patient charts, and she generally focused on getting "the patients . . . in there and paying their fee." (Trial Tr., R. 906, PageID 76794.)

Sufficient evidence also supports the jury's finding that Clemons, Newman, and Womack used the clinics for the purpose of distributing opioids unlawfully. In addition to the number of opioid prescriptions that they issued (in the same proportions, described above), Dr. John Everett

Blake—an anesthesiologist and pain management physician—testified that high-dose opioids accounted for the vast majority of treatment offered at the clinics, and that *none* of the opioid prescriptions he reviewed in about 90 patient files were written for a legitimate medical purpose. Another expert witness testified that none of the files he reviewed contained the necessary elements of a medical chart, noting that medical histories and results from physicals, diagnoses, and treatment plans all fell below the standard of care. *See infra* part II.D.ii. And former patients testified that they visited the clinics to obtain opioids to feed their addictions or to resell.

Moreover, former staff member Stephanie Puckett testified that she and another staff member participated in one of the pharmaceutical kickback schemes, where they received a payout each time they prescribed a specific pain cream. Because Puckett and the other staff member could not write prescriptions themselves, they asked Clemons, Newman,[4] and Womack to participate in the scheme and, according to Puckett, all three women agreed. Womack even allegedly signed a blank prescription for the pain cream, so that Puckett could copy it and place them in the file of every Womack patient with insurance.

Clemons, Newman, and Womack highlight that some of the clinics' former patients testified that they did experience chronic pain and needed medication to control it. But this argument does not change our analysis because:

> [W]e look at a provider's reason for issuing the prescription when determining whether it was issued for a legitimate medical purpose, rather than the patient's underlying conditions . . . a [provider] prescribing opioid painkillers to anyone walking through the door is not saved if a person happens to have an underlying condition that could justify the prescription.

*Chaney*, 921 F. 3d at 590–91 (collecting similar cases).

Clemons, Newman, and Womack also emphasize that some witnesses testified that the defendants acted professionally and ethically with respect to prescriptions. And Dr. Blake testified that reasonable minds could differ as to the standard of care offered by the providers, in

---

[4]Newman disputes that the trial record supports an inference of her involvement in this scheme. Specifically, she highlights Puckett's recross-examination testimony as demonstrating that Newman was not involved. Newman's argument, however, distorts the scope of the recross-examination, and a reasonable jury could have viewed Puckett's testimony as implicating Newman.

part because the Tennessee guidelines at the time did not limit the amount of medication that could be prescribed to a patient. In essence, with these challenges, Clemons, Newman, and Womack ask us to weigh some testimonies over others and to assess witness credibility, which we may not do when considering the sufficiency of the evidence on appeal. *Emmons*, 8 F.4th at 478. There was sufficient evidence for a reasonable jury to conclude that the evidence proved each element of this offense, and we affirm the defendants' convictions.

### ii. Hofstetter's Conspiracy Convictions

Hofstetter also argues that insufficient evidence supported her three conspiracy convictions: a conspiracy to distribute controlled substances at Gallaher View and Lenoir City, a conspiracy to distribute controlled substances at Lovell Road, and a RICO conspiracy.

To prove that Hofstetter participated in the first two drug conspiracies, the government was required to show that she, along with at least one other individual, "agreed to violate a drug law (such as § 841(a)(1)'s ban on distributing drugs) and that [she] knowingly and voluntarily entered into this agreement." *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). Because conspiracy is an inchoate offense, the essence of a conspiracy "is an agreement to commit an unlawful act." *Id.* (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975)). The government did need not to prove that Hofstetter "completed [her] agreed-upon drug crime" or even that she "took an overt act to implement the crime." *Id.* Furthermore, "[a]n agreement can be tacit, not formal, and the 'government may meet its burden of proof through circumstantial evidence.'" *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (quoting *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999), *cert. denied*, 529 U.S. 1029 (2000)).

Benjamin Rodriguez, one of the Florida partners, testified that the partners discussed that they did not intend Gallaher View and Lenoir City to be legitimate clinics, and that Hofstetter was involved in those discussions and aware of their intent. Rodriguez described that Hofstetter "would always call us the three amigos and that we were here to open up a pill mill." (Trial. Tr., R. 936, PageID 74948.) Witnesses also testified that Hofstetter approached Tipton about opening Lovell Road, without the Florida partners, and that she found patients for this new clinic

by soliciting patients that had previously been discharged from other clinics for exhibiting signs of drug abuse.

Rodriguez and Tipton also described how the Florida partners fired Hofstetter from the Hollywood clinic for suspected embezzlement, but then later re-hired her to run the Tennessee clinics and retained her even though they believed her to be embezzling again. The government argued that this evidence further demonstrates that the Florida partners and Hofstetter intended to operate the clinics unlawfully. *See infra* part II.D.i.a. Viewing all the evidence in the light most favorable to the government, we find that there was sufficient support for the jury's conclusion that Hofstetter knowingly agreed to violate a drug law at the clinics. Hofstetter's arguments about conflicting testimony and weight of the evidence are not for us to consider. *See LaVictor*, 848 F.3d at 456.

To prove that Hofstetter participated in a RICO conspiracy, the government was required to show that she "intended to further an endeavor which, if completed, would satisfy all the elements of a substantive RICO criminal offense[.]" *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008) (quotation marks and brackets omitted) (quoting *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005)). A substantive RICO offense requires the government to prove: (1) the existence of an enterprise that affects interstate commerce; (2) Hofstetter's association with the enterprise; (3) Hofstetter's participation in the conduct of the enterprise's affairs; and (4) that the participation occurred through a pattern of racketeering activity. *Id.* at 418.

Hofstetter appears to challenge the evidentiary support for the first element: she suggests that the clinics were not "RICO organization[s]" because there is not substantial evidence that they "unlawfully distribute[d] pain medication outside the usual course of professional practice and for no legitimate medical purpose." (Hofstetter Br. 42–43.) She highlights specific testimony in support. But as already discussed throughout this section, the government submitted sufficient evidence for the jury to find otherwise. Hofstetter offers no other argument as to this charge. We therefore affirm the verdict.

### *iii.  Hofstetter's Distribution Conviction*

Finally, Hofstetter challenges the sufficiency of the evidence supporting her conviction for distributing and dispensing controlled substances outside the scope of professional practice, in violation of 21 U.S.C. § 841(a)(1).  Specifically, Hofstetter argues that "[n]o witness testified that . . . [she] ever engaged in prescribing the medication outside the usual course of professional practice . . . or instructed anyone to do so."  (Hofstetter Br. 41.)

The evidence, however, supports Hofstetter's conviction under an aiding and abetting theory of liability.  To prove Hofstetter was guilty of aiding and abetting unlawful distribution, the government was required to show that she "(1) [took] an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  *Rosemond v. United States*, 572 U.S. 65, 71 (2014).  As discussed above, there was more than sufficient evidence to support the jury's conclusion that Hofstetter took affirmative acts to further the unlawful distribution of opioids, and that she intended to do so.

### *iv.  Hofstetter's Money Laundering Convictions*

Hofstetter generally alleges "that the jury verdict was against the manifest weight of the evidence," but she does not specifically argue that there was insufficient evidence to support her money laundering convictions.  (*See* Hofstetter Br. 40–44.)  Because Hofstetter fails to raise an argument as to these convictions in her brief before this Court, she has forfeited the issue.  *See Watkins v. Healy*, 986 F.3d 648, 667 (6th Cir. 2021).

### D.  Hofstetter's Evidentiary Challenges

Hofstetter challenges three of the district court's evidentiary rulings at trial, each of which pertain to her alone.  We review the district court's evidentiary rulings for abuse of discretion.  *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005).  An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, uses the wrong legal standard, or misapplies the correct standard.  *United States v. Gibbs*, 797 F.3d 416, 422 (6th Cir. 2015).  Absent a "definite and firm conviction" that the district court committed a clear error in judgment, we "leave rulings about admissibility of evidence undisturbed[.]"  *Dixon*, 413 F.3d at

544 (citation omitted).   If we find the district court erroneously admitted evidence, "we ask whether the admission was harmless error or requires reversal of a conviction." *United States v. Churn*, 800 F.3d 768, 775 (6th Cir. 2015).

### i. Evidence of Hofstetter's Embezzlement

This standard applies where, as here, we review a district court's determination that Federal Rule of Evidence 404(b) is inapplicable because the evidence is intrinsic.   *Id.* at 779.   In this circumstance, we "must also find that . . . the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice pursuant to Federal Rule of Evidence 403."   *Id.*   (quoting *United States v. Joseph*, 270 F. App'x 399, 406 (6th Cir. 2008) (per curiam)).

At trial, the government introduced evidence that Hofstetter "embezzled very large amounts of money from other pill mill owners in this case (*i.e.*, [the Florida partners])" multiple times in both Florida and Tennessee.   (Resp. to Def.'s Mot. in Limine, R. 624, PageID 11350.)   The government explained that Hofstetter's alleged embezzlement was "part and parcel of [her] overall criminal conduct in this case" and reflected "the general illegitimacy of the Tennessee clinics."   (*Id*.)   Moreover, the government argued that the Florida partners' willingness to rehire Hofstetter after suspecting her of embezzlement showed that they accepted the "cost of doing illegal business[.]"   (*Id.* at PageID 11350–51.)   Hofstetter moved to exclude evidence about her unindicted embezzlement conduct.

The district court denied Hofstetter's motion orally at a pretrial conference.   Hofstetter then filed a subsequent motion on the same issue, which the district court construed as a motion for reconsideration.   Following a hearing, the district court again permitted the government to admit the evidence for three primary reasons.   First, the district court found that the evidence of the alleged embezzlement was intrinsic because "the alleged thefts [had] a temporal and spatial connection to and arise from the same events as the charged conspiracies."   (Mem. Op. and Order, R. 718, PageID 14246.)   Second, even if the evidence were not intrinsic, it would nevertheless be admissible because it "tend[ed] to show [Hofstetter's] motive and intent in allegedly joining the alleged conspiracies."   (*Id.* at PageID 14250.)   Third, the district court

determined that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice.

At trial, one of the Florida partners testified that the partners fired Hofstetter from the Hollywood clinic because they suspected that she embezzled clinic funds. Tipton testified that the Florida partners also suspected her of embezzling funds at the Gallaher View clinic but decided not to fire her again. The district court overruled Hofstetter's objections at trial, but it instructed the jury to consider the evidence only as it related to Hofstetter's intent and motive to join the conspiracy "and her knowledge that the clinics . . . were allegedly not legitimate pain clinics." (Trial Tr., R. 901, PageID 61954–55.)

Hofstetter does not dispute that the evidence is intrinsic, but instead argues that the district court "relied on clearly erroneous facts that [she] came to Tennessee to start up illegal pain clinics" when it determined that the testimony was relevant to her motive or intent. (Hofstetter Br. 35.) She also argues that the testimony should have been excluded because any relevance was "substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, or misleading the jury[.]" (*Id.*)

### a. Intrinsic Evidence

Under Federal Rule of Evidence 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The purpose of this rule is to prevent the jury from inferring that a defendant "probably committed the crime charged" because she committed other, unrelated crimes. *Emmons*, 8 F.4th at 473 (quoting *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979)).

Rule 404(b) is not implicated, however, when evidence of other crimes or wrongs "is part of a continuing pattern of illegal activity." *United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013) (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)). Such "intrinsic" acts "are those that are inextricably intertwined with the criminal act charged or a part of the criminal activity as opposed to extrinsic acts, which are those that occurred at different times and under different circumstances from the offense charged." *Churn*, 800 F.3d at 779 (internal

quotation omitted). "[E]vidence relating to the background of the charged offense, known as '*res gestae* evidence,' is also considered 'intrinsic . . . .'" *United States v. Sumlin*, 956 F.3d 879, 889–90 (6th Cir. 2020). "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* at 890 (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2008)).

Intrinsic evidence is an exception to Rule 404(b) because it "is probative of the crime charged," so it is not subject to the general prohibition on evidence of prior bad acts. *Sumlin*, 956 F.3d at 889. We therefore allow district courts to admit intrinsic evidence. *Churn*, 800 F.3d at 779.

Here, the district court found that the evidence of Hofstetter's purported embezzlement was intrinsic to the charged offenses because it allegedly occurred during the same period of time and in the same place as Hofstetter's conspiratorial conduct, it directly related to her involvement in the Florida and Tennessee clinics, and it arose from the same events as the embezzling offenses for which Hofstetter was indicted. In other words, the district court found that the evidence was a prelude to, inextricably intertwined with, and probative of the criminal activity for which Hofstetter was being tried. The district court did not abuse its discretion in reaching this conclusion because it correctly applied the appropriate legal standard and relied on accurate findings of fact.

Likewise, the district court did not abuse its "substantial discretion in balancing probative value . . . and unfair prejudice" under Rule 403 when it determined that the embezzlement evidence was not *unfairly* prejudicial. *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir. 1984) (internal quotations omitted) ("The usual approach on the question of admissibility on appeal is to view both probative force and prejudice most favorable towards the proponent, that is to say, to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.") (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03] (1982)). The district court found that the thefts were "not collateral to the charged offenses," so the danger of unfair prejudice did not substantially outweigh the probative value of the theft evidence. (Mem. Op. and Order, R. 718, PageID 14250); *see also Churn*, 800 F.3d at 779.

Because Hofstetter's alleged embezzlement arose from the same—not auxiliary—circumstances as the charged offenses, the district court did not err.  *See United States v. Lang*, 717 F. App'x 523, 531 (6th Cir. 2017) (affirming the district court's admission of evidence that the defendant skimmed cash from a pill mill because "any unfair prejudice that resulted from [its] admission [was] simply not enough" to overcome its "substantial probative force").

### b. Motive or Intent

Even if the embezzlement evidence were not intrinsic, Rule 404(b) would not bar its admission because relevant evidence of "other crimes, wrongs, or acts" is admissible for non-propensity purposes, such as proving intent or knowledge.  Fed. R. Evid. 404(b)(1)–(2); *United States v. Clay*, 667 F.3d 689, 693–94 (6th Cir. 2012).  The district court may admit such evidence under Rule 404(b) if it determines that: (1) there is sufficient evidence the act occurred; (2) the act is admissible for a proper purpose; and (3) the probative value is not substantially outweighed by the danger of unfair prejudice.  *United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011).[5]

Here, the embezzlement evidence was admissible under Rule 404(b).  First, there was sufficient evidence that Hofstetter was fired from the Hollywood clinic for embezzlement and that the Florida partners believed she was embezzling funds again in Tennessee.  Two of Hofstetter's co-conspirators testified at length about her embezzlement, and Hofstetter did not dispute that she embezzled clinic funds.  Second, the embezzlement evidence was offered for two non-propensity purposes: to support the charge that Hofstetter intended to conspire with the Florida partners, and to show that Hofstetter knew the clinics were being operated illegally.  Both are permissible purposes under Rule 404(b).  Fed. R. Evid. 404(b)(2).  Third, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  For all these reasons, we affirm the district court's decision to admit the embezzlement evidence.

---

[5]Our precedent reflects an intra-circuit split about the appropriate standard of review when reviewing evidentiary rulings under Rule 404(b).  *Compare Clay*, 667 F.3d at 694 (using de novo review because determining "whether the evidence was admitted for a proper 404(b) purpose . . . is a question of law"), *with United States v. Jenkins*, 345 F.3d 928, 936 (6th Cir. 2003) (reviewing for abuse of discretion).  Because Hofstetter's claim fails under the less deferential de novo review, we need nod decide which standard of review should apply to Rule 404(b) challenges.

### ii. Michael Carter's Testimony

At trial, the government called Michael Carter as an expert witness. Carter had been a nurse practitioner for 45 years, and he held multiple advanced degrees in nursing, including a Doctor of Nursing Science. He testified about the standard of care for nurse practitioners; how nurses formulate diagnoses and develop therapeutic plans; Tennessee legal requirements for nurse practitioners prescribing drugs; and registered nurses' general knowledge of controlled substance prescriptions. Carter also reviewed 90 patient files from the clinics and assessed their adequacy in terms of patient history, family history, medical history, description of the medications prescribed, and notes regarding examinations, practitioners' findings, treatment goals, and follow-up.

Hofstetter moved to strike Carter's testimony, arguing that he lacked expertise in pain management and therefore could not assess whether the prescriptions were issued for legitimate medical purposes. The district court denied the motion, concluding that Carter's testimony was properly confined to his area of expertise. The district court later evaluated the same challenge again when it ruled on Hofstetter's motion for judgment of acquittal.

Federal Rule of Evidence 702 governs the admissibility of expert testimony and permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education [to] testify in the form of an opinion or otherwise[.]" Fed. R. Evid. 702. Rule 702 "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993). We apply a four-prong test to determine the admissibility of expert testimony: "(1) a qualified expert (2) testifying on a proper subject (3) which is in conformity to a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect." *Id.* (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1208 (6th Cir. 1988)). On appeal, Hofstetter challenges only the first two prongs—i.e., that Carter was not qualified and that he testified on an improper subject—but she does not identify an erroneous factual finding or an improper use of legal standards.

Regarding the first prong, the district court carefully analyzed Carter's qualifications and concluded that Carter's five degrees in nursing and his extensive clinical and professional

experience qualified him "to testify to the standard of care for nurse practitioners across specialties." (Order, R. 794, PageID 38776.)  The district court recognized that Carter did not qualify as a pain-management expert.

Regarding the second prong, Hofstetter argues Carter should not have been allowed to opine on whether the prescriptions were issued for legitimate medical purposes because such testimony required pain-management expertise that he did not have.  The district court, however, found that Carter did not testify to the ultimate issue of whether there was a legitimate medical purpose for the various prescriptions in the files he reviewed.  Instead, the district court concluded that Carter testified about whether the *content of the files* offered a basis for a legitimate prescription:

> While the government did repeatedly ask the witness whether there was a legitimate medical purpose for prescriptions in certain medical files, . . . [t]he context of these questions and responses makes clear that the government was not eliciting opinions from the witness as a pain management expert, which he admittedly is not, but rather asking him to testify to whether he could identify a legitimate medical purpose for the prescription based on the content of the files. Each exchange took place immediately after the government took the witness through a specific file and asked him questions about the file's adherence to the standard of care.  Thus, by testifying that he could not identify such a legitimate purpose for the prescription, the witness was testifying to a failure of the standard of care, i.e., an inadequate history, inadequate physical, inadequate assessment and an inadequate plan.

(*Id.* at PageID 38778–79 (internal modifications omitted).)

The record supports the district court's conclusion that Carter limited his assessments to the content of the files and the extent to which the files demonstrated that the clinics' nurse practitioners adhered to the standard of care, which fell within his area of expertise. Accordingly, Carter did not testify as a pain-management expert, and the district court did not abuse its discretion by refusing to strike his testimony.

### iii.  Rebuttal Evidence

Hofstetter, along with the other defendants, called two expert witnesses who also examined  fifteen patient files from the clinics.  The defense's expert witnesses concluded that

the patients had been prescribed opioids for legitimate medical purposes.  To rebut this testimony, the government called four of the fifteen patients.  Hofstetter objected to this testimony before and during trial, arguing that it did not constitute rebuttal evidence, and she repeated her argument when she moved for a new trial.  The district court ruled that the rebuttal witnesses' testimony "fell within the proper scope of rebuttal testimony" because it "defused the impact of the opinion testimony offered by defendants' witnesses that the prescriptions those four (4) patients received . . . were prescribed for a legitimate medical purpose and within the usual course of professional practice."  (Mem. Op. and Order, R. 951, PageID 70975.)  Hofstetter alone now argues that the patients were not proper rebuttal witnesses.

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."  *United States v. Levy*, 904 F.2d 1026, 1031 (6th Cir. 1990) (quoting *United States v. Papia*, 560 F.2d 827, 848 (7th Cir. 1977)).  Hofstetter therefore argues unpersuasively that the rebuttal witnesses served an improper purpose.  The defense's expert witnesses testified that practitioners at the clinics issued legitimate opioid prescriptions to at least some patients.  In rebuttal, the government called four of those patients, all of whom testified that they had been addicted to drugs when they went to the clinics, that it was easy to obtain opioid prescriptions at the clinics, and that they used the prescriptions they received to fuel their addictions.  Because this rebuttal testimony casted doubt on the legitimacy of the prescriptions and the practitioners' adherence to the standard of care with respect to those specific patients, the rebuttal witnesses defused the impact of the defense's expert testimony and served a proper function.

Hofstetter also contends that the rebuttal witnesses were improper because the government could have questioned them earlier in the trial.  But rebuttal testimony "is not limited by the fact that the [government] could have introduced the proffered evidence in [its] case-in-chief."  *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005); *see also United States v. Bland*, No. 06-5876, 2007 WL 2781114, at *3 (6th Cir. Sept. 25, 2007).  The timing of when these witnesses were called is therefore irrelevant.  For these reasons, Hofstetter has failed to show that the district court abused its broad discretion in permitting the government's rebuttal witnesses to testify.

In sum, the district court did not abuse its discretion when it admitted evidence about Hofstetter's unindicted embezzlement, declined to strike Carter's assessments of the patient files, and permitted the government's rebuttal witnesses. We affirm each of the district court's contested evidentiary rulings as to Hofstetter. *See Levy*, 904 F.2d at 1031.

**E.  The Fairness of Hofstetter's Trial**

Hofstetter alleges that the government violated her constitutional right to a fair trial for three reasons: (1) the government destroyed patient files seized during the 2010 investigation of the Hollywood clinic; (2) the government breached its *Brady* obligations by failing to disclose information about a criminal investigation of Walmart; and (3) the government committed prejudicial prosecutorial misconduct during closing arguments by making comments that impermissibly shifted the burden of proof to Hofstetter. We consider each argument in turn.

### *i. Spoliation*

We review the district court's conclusions of law de novo. *United States v. Cody*, 498 F.3d 582, 586 (6th Cir. 2007). When the district court's conclusion is based on spoliation, "[t]he district court's factual determinations giving rise to the spoliation finding are reviewed for clear error." *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 383 (6th Cir. 2013) (citing *Adkins v. Wolever*, 692 F.3d 499, 506 (6th Cir. 2012)). "The evidence must be considered in the light most favorable to the party that prevailed in the court below . . . ." *United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006).

In December 2010, the DEA seized about 1,900 patient files at the Hollywood clinic pursuant to a search warrant. The warrant and seizure followed a year-long investigation of the clinic, which was precipitated by signs of the clinic's illegal practices and included undercover agents who posed as patients. After the seizure, the DEA reviewed the files pertaining to the undercover officers but did not review other patient files. Ultimately, the case was not prosecuted due to an overwhelming caseload at the U.S. Attorney's Office. Pursuant to a Florida medical board requirement, the DEA destroyed the patient files after five years.

Meanwhile, the FBI's investigation into the Tennessee clinics was underway. A detective involved in the FBI investigation became aware of the DEA's 2010 Hollywood clinic investigation and reached out to the DEA to obtain the files in late 2015. The FBI detective and the DEA agent discussed transferring the 2010 Hollywood files to the FBI, but the DEA agent never did so. The agent stopped responding to the FBI detective's inquiries about the files, first because of her involvement with an out-of-state murder investigation, and then because of the unexpected death of her husband. The agent then left the DEA without telling the detective, and the DEA agent who inherited the case destroyed the files according to Florida law.

Hofstetter sought to suppress all evidence of the treatment of patients at the Hollywood clinic associated with the patients' files that were seized by the DEA. Alternatively, Hofstetter asked the district court to instruct the jury that the files would have been exculpatory for her and unfavorable to the government. A magistrate judge held an evidentiary hearing and recommended denying the motion, and the district court adopted the magistrate's recommendation. Later, Hofstetter asked the district court to enter a judgment of acquittal or grant a new trial based on spoliation, which the district court also denied. On appeal, Hofstetter once again argues that her due process rights were violated due to spoliation.

The Due Process Clause of the Fourteenth Amendment requires criminal prosecutions to "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Fairness requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Id.* For this reason, the prosecution must deliver "exculpatory evidence into the hands of the accused[.]" *Id.* Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a defendant's due process rights are violated when material exculpatory evidence is suppressed, regardless of whether the suppression results from good or bad faith. *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). But when the government "fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to [a] defendant, we apply a different test." *Id.* (internal quotation omitted). Potentially useful evidence is that "of which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (emphasis added). In this scenario, a defendant must establish three elements: (1) that the

government acted in bad faith when it failed to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before it was destroyed; and (3) that the defendant would not be able to obtain comparable evidence by other reasonable means. *Jobson*, 102 F.3d at 218 (citing *Youngblood*, 488 U.S. at 57–58).

Here, the Hollywood clinic patient files were never reviewed, so there was no evidence that they were materially exculpatory. Because the files were only potentially useful, we proceed to the *Youngblood* test.

The first two elements are inter-related because the "presence or absence of bad faith by the [government] for purposes of the Due Process Clause must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* (quoting *Youngblood*, 488 U.S. at 56–57 n.*). To establish bad faith, Hofstetter must show "official animus" or a "conscious effort to suppress exculpatory evidence." *Id.* (internal quotation omitted). But neither the DEA nor the U.S. Attorney's Office reviewed the content of the files before they were destroyed, and there is no evidence that the government suspected the files were exculpatory. Furthermore, the files were destroyed as part of a standard, state-mandated file closure process, so there is no suggestion of animus.

Hofstetter also had other reasonable means to obtain comparable evidence after the 2010 Hollywood files were destroyed. She had access to substantively similar patient files from the Hollywood clinic for the time period of December 2010 to December 2015, and she could have used them to argue that the patients at the Hollywood clinics received legitimate prescriptions for controlled substances. *See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1103 (6th Cir. 1990) (en banc). Hofstetter has not established any of the *Youngblood* elements, nor has she shown any error in the factual findings of the district court. The district court was therefore correct in declining to acquit Hofstetter or grant a new trial based on spoliation.

*ii.* Brady *Obligations*

"We review denials of a motion for a new trial based on *Brady* violations for abuse of discretion, but assess the existence of a *Brady* violation de novo." *United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014).

The government called Stan Jones as an expert witness to testify based on his experience investigating pill mills for the DEA. At trial, Jones testified about the customs and red flags of pill mills, prescribing practices of nurse practitioners at pill mills, characteristics of patient charts at pill mills, and DEA regulations pertaining to pill mills. Jones retired from the DEA and began working at Walmart as a Global Investigator in November 2018. He remained in that position at the time of his testimony.

After trial, Hofstetter presented an article by ProPublica—an investigative journalism publication—which reported that Walmart was the subject of a Department of Justice investigation for its past opioid dispensing practices. Hofstetter then moved for a judgment of acquittal, arguing in part that the government violated her due process rights by failing to disclose the Walmart investigation per its *Brady* obligations. Specifically, Hofstetter argued that she could have used the information to impeach Jones's testimony. The district court denied her request, finding that it was "unclear how an investigation of practices [at Walmart] that likely predated [Jones's] arrival . . . could have been used to impeach him, especially because [he] testified based on his experience not as a Walmart employee but as a DEA agent[.]" (Mem. Op. and Order, R. 951, PageID 70964–66.) On appeal, Hofstetter repeats her Walmart argument verbatim.

*Brady* requires the government to turn over evidence to a defendant if it is "both favorable to the accused and material to guilt or punishment." *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008). To determine whether the government violated its *Brady* obligation, we look to three elements: (1) the challenged evidence must favor the defendant, "either because it is exculpatory, or because it is impeaching"; (2) the government must have suppressed the evidence, "either willfully or inadvertently"; and (3) the defendant must have incurred prejudice. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). To establish prejudice, Hofstetter must show "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281, 289.

Here, a *Brady* violation did not occur. First, there is no evidence demonstrating that the information about Walmart would impeach Jones. Nothing indicates that Jones worked at Walmart while the company engaged in allegedly criminal distribution practices, and Jones did

not testify based on his experience at Walmart. Second, there is no evidence that the government had access to the information about Walmart and suppressed it. *See United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (noting that the government has a duty to "disclose material evidence that is favorable to the defendant over which the prosecution team has control"). Third, even if the Walmart information had some impeachment value and the government had suppressed this evidence, Hofstetter cannot show that the nondisclosure would have produced a different verdict. Additionally, because other articles on the Walmart investigation predated the ProPublica article and were available to Hofstetter at the time of trial, she cannot establish prejudice. Finding that no element of the *Brady* test has been satisfied, we affirm the district court.

### iii. Closing Remarks

"Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact," and we review them de novo. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009).

After trial, Hofstetter challenged three statements made during closing arguments, contending that each impermissibly attempted to shift the burden of proof. The first pertains to a comment the government made during closing when it summarized the testimony of two witnesses—Kim Chambers and Gayle Fristoe—both of whom had briefly worked at the clinics:

> I want you to think about the raw emotion you saw, especially from Ms. Fristoe[,] when they talked about working at these places years after the fact. Especially with Ms. Fristoe, you could tell she still felt that emotion from being even a small part in perpetuating these places. Guilt that you've never heard about from these three defendants.
>
> We discussed decisions and choices. Ms. Chambers, five shifts, Ms. Fristoe, 24 shifts, Ms. Newman, five and a half months, Ms. Womack, 11 months, three of which she had her DEA license, Cynthia Clemons, 16 months.

(Trial Tr., R. 885, PageID 60813.) Hofstetter claims that the phrase, "guilt you never *heard* about from these three defendants" violated the rule that defendants are not obligated to present evidence or prove their innocence. (Hofstetter Br. 24 (original emphasis modified).)

Second, during Hofstetter's closing argument, defense counsel made a series of assertions about an individual who did not testify, including: "She is an investigator.  She's a nurse by profession. . . . [S]he works for the Department of Health. . . . If there's been a complaint, she goes and checks the complaint out."  (Trial Tr., R. 885, PageID 60961–62.)  The government objected to these statements because they were not supported by evidence in the record, emphasizing that the defense had "subpoena power" but "did not subpoena" the individual about whom they were speaking.  (*Id.* at PageID 60962.)  Hofstetter argued the subpoena statement "was a direct effort to shift the burden" by suggesting that Hofstetter "had an obligation to subpoena and call a witness in the case."  (Hofstetter Br. 24–25.)

> Third, during the government's rebuttal argument, the prosecutor told the jury:
>
> Remember, as we get into this, that every single fact witness you heard of, like they put up two opinion witnesses and an investigator to talk about some stats, every fact witness, every person who saw something, smelled something, felt something, did something, heard something, someone who was there, somebody with knowledge, those—every single one of those witnesses was put on by the United States.

(Trial Tr., R. 897, PageID 61704.)  Hofstetter argues that this statement "is a clear comment on the fact that the defendants did not call a fact witness[.]"  (Hofstetter Br. 25.)

"[A] prosecutor is entitled to comment on a defendant's failure to call witnesses to contradict the government's case," but "must avoid commenting in such a way that he treads on the defendant's constitutional rights and privileges," such as the right not to testify.  *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993).  To evaluate whether a prosecutor's comments constitute misconduct, we use a two-step test.  *Carson*, 560 F.3d at 574.  We first determine whether the statements were improper.  *Id.*  If the statements were improper, we then consider whether they were flagrant and warrant reversal.  *Id.*  Flagrancy is assessed through four factors: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong."  *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

Taking the third statement first, the government's rebuttal statement was not improper. The government may comment on a defendant's failure to rebut evidence, so long as a rebuttal witness was available, and the prosecutor does not comment "implicitly or explicitly on the defendant's failure to testify." *Moore v. Mitchell*, 708 F.3d 760, 806 (6th Cir. 2013). This is especially true when the government responds to a defense assertion that "open[s] the door to [the] rebuttal." *United States v. Wimbley*, 553 F.3d 455, 461 (6th Cir. 2009) (citation omitted). And this is exactly what happened here—the government responded to the defense's suggestion that the government obfuscated certain aspects of the evidence by highlighting the number of its fact witnesses. The rebuttal comment therefore had a proper purpose and did not impugn Hofstetter's decision not to testify.

The second statement at issue was also proper. The government was entitled to object to the defense's closing remark because it was not supported by evidence in the record. To emphasize that point, the government stressed that the defense could not speculate about a witness it chose not to call, but it did not shift the burden to Hofstetter to call witnesses in her defense.

Finally, the first statement does not constitute prosecutorial misconduct. For starters, the statement referred to "these three defendants"—meaning Clemons, Newman, and Womack, but not Hofstetter. (*See* Trial Tr., R. 885, PageID 60813.) Even assuming that the statement somehow implicitly suggested that Hofstetter failed to testify, the statement was not flagrant. The source of any impropriety stems from a single word—"from"—that the prosecutor used. Had the prosecutor said, "[g]uilt that you've never heard about *regarding* these three defendants," the statement would have been proper. *See Wimbley*, 553 F.3d at 461. Relative to the extensive evidence put forth over the course of a four-month trial, this isolated word cannot alone mislead the jury or prejudice Hofstetter. Likewise, nothing in the trial transcript indicates that the government deliberately made the statement improperly. For all these reasons, we find that no prosecutorial misconduct occurred.

Finding that Hofstetter's constitutional right to a fair trial was not violated, we decline to order a new trial on this basis and affirm the district court.

**F.  The Consistency of the Jury's Verdict**

Hofstetter, Clemons, and Newman were each convicted of at least one count of maintaining a drug-involved premises.  Clemons and Newman were acquitted of distributing controlled substances, and Hofstetter was acquitted of two counts of this offense but convicted of one.  Clemons and Newman were also acquitted of conspiring to distribute controlled substances.  Hofstetter, Clemons, and Newman argue that they are entitled to a new trial because the jury's verdicts as to these counts are "so inconsistent that they are arbitrary and irrational[.]"  (Clemons Br. 48; *accord* Newman Br. 32–35.)

Generally, we do not review allegedly inconsistent verdicts in criminal cases.  *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015).  This is because the Supreme Court has held that a jury may "announce logically inconsistent verdicts in a criminal case."  *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990).  Juries are permitted "to acquit out of compassion or compromise or because of . . . lenity."  *United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009) (internal quotations omitted).  Accordingly, an inconsistent verdict is as likely to result from the jury's error in acquitting a defendant of one offense as it is from the jury's error in convicting her of another.  *Id.* at 261–62 (citation omitted).  Put differently, when an inconsistent verdict occurs, "it is unclear whose ox has been gored."  *United States v. Powell*, 469 U.S. 57, 65 (1984).  And because the government "is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course."  *Id.*  Rather, the defendant's protection derives from "independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."  *Id.* at 67.

There are two exceptions to this general rule.  We may review an inconsistent verdict only when: (1) the verdict is "marked by such inconsistency as to indicate arbitrariness or irrationality," or (2) "a guilty verdict on one count necessarily excludes a finding of guilt on another."  *Randolph*, 794 F.3d at 610–11 (internal quotations omitted).  The defendants' arguments do not implicate this latter exception, which only applies when a defendant is *convicted* of two "logically inconsistent" crimes.  *United States v. Smith*, 749 F.3d 465, 498 (6th Cir. 2014) (quoting *United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010)); *see also*

*Powell*, 469 U.S. at 69 n.8.  And, as we explain below, the first exception is not satisfied because the verdict is not arbitrary or irrational.

### i. The Drug-Involved Premises Conviction and Conspiracy Acquittals

By convicting the defendants under § 856(a)(1), the jury must have found that they each "knowingly open[ed], lease[d], rent[ed], use[d], or maintain[ed] . . . , whether permanently or temporarily," at least one clinic for the purpose of illegally distributing controlled substances. *Elenniss*, 729 F. App'x at 428 (alterations in original).  To find Clemons and Newman guilty of conspiring to distribute controlled substances unlawfully, the jury would have needed to find they "agreed to violate a drug law (such as § 841(a)(1)'s ban on distributing drugs) and that [they] knowingly and voluntarily entered into this agreement." *Wheat*, 988 F.3d at 306.  What then, explains the jury's acquittal on the conspiracy counts?  The jury could have found that the government proved beyond a reasonable doubt that the defendants used the clinics for unlawful drug distribution, but not that they knowingly entered an agreement to violate a drug law.  Such a finding is internally consistent.

This logic applies even if the jury convicted Clemons, Newman, and Womack of maintaining a drug-involved premises under an aiding and abetting theory.  If the jury found the defendants guilty of aiding and abetting the maintenance of a drug-involved premises, it would have concluded that they took "an affirmative act in furtherance of th[e] offense" and intended to facilitate the offense's commission.  *Rosemond*, 572 U.S. at 71.  Aiding and abetting does not "presuppose the existence of an agreement." *United States v. McCullah*, 745 F.2d 350, 355 (6th Cir. 1984) (quoting *Pereira v. United States*, 347 U.S. 1, 11 (1954)).  Instead, aiding and abetting "have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Id.* (citation omitted).  In other words, "[c]onspiring to commit a crime with another and aiding and abetting in its substantive commission are distinct crimes." *United States v. Holmes*, 797 F. App'x 912, 918 (6th Cir. 2019) (quoting *United States v. Townes*, 512 F.2d 1057, 1058 (6th Cir. 1975)).  Conspiracy requires an agreement; aiding and abetting does not.

The different elements of these two distinct offenses demonstrate that it was not arbitrary or irrational for the jury to convict Clemons, Newman, and Womack of maintaining a drug-involved premises while simultaneously acquitting them of conspiring to distribute controlled substances.

### ii. *The Drug-Involved Premises Conviction and Distribution Acquittals*

The same is true regarding the jury's acquittal of Clemons and Newman on the substantive distribution charges. The distribution counts alleged that Clemons, Womack, and Hofstetter illegally distributed controlled substances on specific occasions: on or about November 14, 2013, on or about February 10, 2014, and on or about September 8, 2014. The jury found that the government met its burden of proof only as to Hofstetter and the November 14, 2013 occurrence. Acquitting Clemons and Womack of their charges means that the jury determined the government did not prove that they had distributed controlled substances illegally (or aided and abetted someone who did) on those specific dates. This outcome is not per se inconsistent with the maintaining-a-drug-involved premises convictions. The jury may have concluded that Clemons and Womack illegally distributed controlled substances on dates other than those listed in the indictment. Alternatively, the jury may also have concluded that Clemons and Womack aided and abetted the use of the clinics for the purpose of distributing controlled substances—i.e., they took an affirmative step to further the offense—but that they did not illegally distribute the prescriptions themselves. These possibilities demonstrate that the jury's verdict does not warrant appellate review.

### iii. *Hofstetter's Conviction and Newman's Acquittal of Illegal Distribution*

Finally, Hofstetter alone argues that it was internally inconsistent for the jury to convict her and simultaneously acquit Newman of the same count of aiding and abetting the distribution of controlled substances. She claims that her guilt depends on Newman's guilt because they were both charged with aiding and abetting each other.

The relevant count of the indictment alleges the following: "[O]n or about November 14, 2013 . . . SYLVIA HOFSTETTER and COURTNEY NEWMAN, *and others*, aided and abetted by one another" knowingly distributed controlled substances unlawfully. (Fourth Superseding

Indictment, R. 320, PageID 5235 (emphasis added).)    Similarly, the jury concluded that "defendants Hofstetter and Newman, aided and abetted by one another *and others*" knowingly did the same. (Jury Verdict, R. 860, PageID 60531 (emphasis added).)  Based on this language, the jury could have decided that the government submitted sufficient evidence to show that Hofstetter aided and abetted some other nurse practitioner in issuing an illegal prescription—either alone or with other staff members or the Florida partners—but that the government did not produce enough evidence to prove beyond a reasonable doubt that Newman was involved. Accordingly, the verdict is not irrational.

Admittedly, the evidence presented in this case suggests that the outcome on this count is somewhat inconsistent.  But we may not review a claim of inconsistent verdicts between co-defendants on appeal.  *See United States v. Ross*, 703 F.3d 856, 883 (6th Cir. 2012) (declining to review the jury's decision to acquit one co-conspirator, but not the other).  "[A]ll we know is that the verdicts are inconsistent"—we do not know whether the jury "really meant" to acquit or convict.  *Powell*, 469 U.S. at 68.  For this reason, Hofstetter must rely on sufficiency-of-the-evidence review to overturn her conviction, and we have already concluded that the record supports the jury's verdict.  Having been "found guilty beyond a reasonable doubt after a fair trial, [Hofstetter] has no constitutional ground to complain that [Newman] was acquitted."  *See Randolph*, 794 F.3d at 610 (quoting *Harris v. Rivera*, 454 U.S. 339, 348 (1981)).

In sum, the jury's decision to acquit Clemons, Newman, and Womack of conspiracy and the substantive drug offenses is not inconsistent with the jury's decision to convict them of maintaining a drug-involved premises.  And the jury's decision to convict Hofstetter and acquit Newman of aiding and abetting the issuance of the same unlawful prescription is not reviewable.

### III. CONCLUSION

For the reasons articulated above, we affirm the district court on all issues.